# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | | |
|---|---|---|
| JANICE LYNETTE ALLEN, as Successor in Interest, and as Administrator of the Estate of Timothy Lional Allen, | * * * * * | |
| Plaintiff, | * * | |
| v. | * * | CV 115-147 |
| UNITED STATES OF AMERICA, | * * | |
| Defendant. | * | |

# O R D E R

Before the Court is Defendant's motion for summary judgment. (Doc. 32.) The Clerk of Court gave Plaintiff timely notice of Defendant's summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 33.) Therefore, the notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), have been satisfied. Plaintiff filed a response and sur-reply in opposition, and Defendant filed a reply and sur-reply in support. (Docs. 38, 40, 44, 46.) The time for filing materials in opposition has expired, and the motion is ripe for consideration. Upon consideration of the record, relevant law,

and the parties' respective briefs, Defendant's motion for summary judgment is **GRANTED**.[1]

## I. BACKGROUND

Prior to his death, Timothy Lional Allen ("Decedent"), a veteran of the United States Army, received treatment from the Charlie Norwood VA Medical Center in Augusta, Georgia (the "VA"). (Defendant's Statement of Material Facts as to Which There is No Dispute ("DSMF"), Doc. 32-8,[2] ¶ 2; Doc. 29, ¶ 6.)

---

[1] Defendant's motion for summary judgment also included a motion to exclude the expert testimony of Plaintiff's sole expert witness, Daniel E. Buffington, Pharm.D. (Doc. 32.) Because Defendant is entitled to summary judgment regardless of the admissibility of Dr. Buffington's testimony, the Court need not reach that issue.

[2] Federal Rule of Civil Procedure 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to *particular parts* of materials in the record." FED. R. CIV P. 56(c)(1)(A) (emphasis added); see also FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); FED. R. CIV. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . (2) consider the fact undisputed for purposes of the motion; [or] (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it . . . ."). This Court's local rules further require that, "in addition to the brief [in support of a motion for summary judgment], there shall be annexed to the motion a *separate*, short and concise statement of the material facts as to which it is contended there exists no genuine dispute to be tried." LR 56.1, SDGa (emphasis added). These local rules further provide that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by *a statement served by the opposing party*." Id. (emphasis added). Moreover, they require that "[e]ach statement of material fact *shall be supported by a citation to the record.*" Id. (emphasis added). Here, Defendant's DSMF fully complies with the aforementioned rules. (See Doc. 32-8.) Plaintiff, however, has ignored these rules and has instead simply stated in the body of her response brief that she objects to portions of Paragraphs 30, 39, and 41 of Defendant's DSMF supported solely by bald assertions that the relevant portions of these paragraphs are "disputed by the plaintiff and the expert opinion affidavit of Dan Buffington, PharmD." (See Doc. 38, at 4-5.) These generalized denials, provided without citations to particular parts of materials in the record, are insufficient to satisfy Plaintiff's aforementioned obligations. See, e.g., Little v. Cox's Supermarkets, 71 F.3d 637, 641 (7th Cir. 1995) ("[A] party contesting summary

2

Decedent was referred to the VA's urology clinic "'after a [prostate specific antigen ("PSA")] screening test revealed elevation of his PSA'" level between September 2010 and June 21, 2011. (DSMF ¶ 6 (quoting Doc. 32-1, at 31).) At an appointment at the VA's urology clinic on June 22, 2011, Decedent was prescribed antibiotics "'for possible prostatitis, one possible cause of his increasing PSA'" and "advised to follow up in four to six weeks for an additional PSA screen." (Id. (quoting Doc. 32-1, at 32).) At this follow-up visit on July 20, 2011,

---

judgment has a responsibility . . . to highlight which factual averments are in conflict as well as what record evidence there is to confirm the dispute. . . . A court need not make the lawyer's case." (internal quotations and citations omitted)); Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920-22 (7th Cir. 1994) ("[B]ecause summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. The parties, in turn, bear a concomitant burden to identify the evidence that will facilitate this assessment. . . . [D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions. We have . . . repeatedly upheld the strict enforcement of these rules, sustaining the entry of summary judgment when the non-movant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts." (citations omitted)); United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Nevertheless, the Court will not deem admitted those portions of Paragraphs 30, 39, and 41 of Defendant's DSMF which Plaintiff has conclusorily-denied but rather will treat them as if they had been properly disputed by Plaintiff. All other material facts set forth in Defendant's DSMF, however, are deemed admitted. See LR 56.1, SDGa. Further, while Plaintiff has attempted to introduce her own statement of undisputed facts in her response brief, she has either: (i) failed to cite to particular parts of materials in the record (other than general references to her amended complaint or Defendant's motion for summary judgment) to support the vast majority of these statements (doc. 38, at 5 ¶¶ A, B, C, D, F, G); or (ii) cited to materials that do not actually support her proffered statements (compare doc. 38, at 5 ¶¶ B, E, G; with doc. 28, at 1; and doc. 32-1, at 3-4). See Walker v. Darby, 911 F.2d 1573, 1576 (11th Cir. 1990) ("A party opposing summary judgment may not rest upon the mere allegations or denials in its pleadings."). Accordingly, the Court does not deem as admitted any of the facts set forth in Plaintiff's purported statement of undisputed material facts (except to the extent the facts underlying those statements have otherwise been admitted).

Decedent's PSA level was tested and he was advised to return for another follow-up in six months. (Id. ¶ 7 (citing Doc. 32-1, at 29-30).) During his next follow-up visit on January 18, 2012, Decedent's PSA level was tested again and he was advised to return for a follow-up visit in July 2012.[3] (Id. ¶ 8 (citing Doc. 32-1, at 24-25).)

At a follow-up visit to the VA's urology clinic on July 25, 2012, Decedent's PSA level was tested again and he was scheduled for another follow-up visit six months later. (Id. ¶ 10 (citing Doc. 32-1, at 20-21).) The results of the July 25, 2012 PSA screen - apparently obtained after Decedent had already left the clinic - were noted to be "'the highest value yet'" and, "given their persistent elevation," it was decided that Decedent should be instructed to return to the clinic and schedule a preoperative evaluation for a biopsy of his prostate. (Id. (citing Doc. 32-1, at 21); Doc. 32-1, at 21.) Accordingly, on July 26, 2012, a medical student called Decedent at his phone number of record. (DSMF ¶ 11 (citing Doc. 32-1, at 21-22; and Doc. 32-4, ¶¶ 4-5).) When Decedent did not answer, however, the medical student left a message advising Decedent of his elevated PSA level and requesting that he contact the VA's urology clinic to schedule a biopsy of his prostate. (Id.) Nevertheless, Decedent did not schedule the biopsy or return to the VA's

---

[3] In an addendum to his medical notes, a staff physician at the VA noted that another PSA screen of Decedent was performed on March 21, 2012. (DSMF ¶ 9 (citing Doc. 32-1, at 28).)

4

urology clinic until January 22, 2013, where his PSA level was tested again and a biopsy of his prostate was scheduled for March 11, 2013. (Id. ¶ 12 (citing Doc. 32-1, at 18-19).) Based on the results of this biopsy, Decedent was diagnosed with prostate cancer. (Id. ¶ 13 (citing Doc. 32-1, at 16); see also Doc. 28, at 1 ("In March 2013, [Decedent] was diagnosed with prostate cancer and began treatment at the [VA].").)

During a visit to the VA's hematology and oncology clinic on May 16, 2014, the physicians attending to Decedent noted that he had developed bone metastasis (i.e., cancer had spread to several of his bones). (Id. ¶ 23 (citing Doc. 32-1, at 8-9).) These physicians recommended that Decedent receive Zometa (zoledronic acid) to treat his bone metastasis.[4] (Id.) Decedent's kidney function was also evaluated during this visit.[5] (Id. (citing Doc. 32-1, at 6).) On May 23, 2014, Decedent's kidney function was checked again and he was subsequently administered 4 mg of Zometa by intravenous infusion by a

---

[4] "Zometa is a pharmaceutical drug that is approved by the FDA to manage bone metastasis occasioned by tumors such as prostate cancer." (DSMF ¶ 16 (citations omitted); see also Doc. 28, at 1 ("Zometa (zoledronic acid) is a bisphosphonate agent and is FDA-approved for the management of bone metastasis due to solid tumors, including prostate cancer that has progressed after treatment with at least one hormonal therapy.").) "[R]enal toxicity is a known side effect of Zometa" and "specific dosage adjustments are recommended for patients with decreased renal function and the drug should not be used in patients with severe renal dysfunction." (DSMF ¶ 17 (internal quotations, citations, and alterations omitted).)

[5] On May 5, 2014, Decedent was admitted to the VA and was "observed to have suffered an 'A[cute] K[idney] I[njury]'" that resolved within a day of his admission (i.e., by May 6, 2014). (DSMF ¶ 22 (quoting Doc. 32-1, at 14); see also Doc. 32-1, at 6, 10-15.)

5

registered nurse at the VA. (Id. ¶¶ 24-26 (citing Doc. 32-1, at 2-4).)

Decedent's kidney function was checked again at the VA on June 12, 2014. (Id. ¶ 30 (citing Doc. 32-2, at 2).[6]) On June 13, 2014, Decedent left the VA against medical advice. (Id. ¶ 31 (citing Doc. 32-1, at 2).) Later that same day, Decedent was admitted to Doctors Hospital of Augusta ("DHA") for symptomatic anemia. (Id. ¶ 32 (citing Doc. 32-3, at 18).) During an oncology consult at DHA on June 16, 2014, the physician attending to Decedent noted that Decedent was due for an infusion of Zometa but - because Zometa was not available at DHA - he received Aredia (pamidronic acid) instead.[7] (Id. ¶ 34 (citing Doc. 32-3, at 27).) Decedent was discharged from DHA on June 18, 2014. (Id. ¶ 36 (citing Doc. 32-3, at 33).) Notably, during the course of his admission to DHA between June 13 and 18, 2014, Decedent's kidney function was evaluated four times. (Id. ¶ 33 (citing Doc. 32-3, at 23, 30, 36, 40).) Decedent was readmitted to DHA on June 21, 2014 and diagnosed with acute renal failure on June 22, 2014. (Id. ¶¶ 37-38, 40 (citing Doc. 32-3, at 2, 9, 13).) Decedent was discharged from DHA to hospice care on June 26, 2014. (Id. ¶ 37 (citing Doc. 32-3, at

---

[6] Notably, while Plaintiff purports to object to Paragraph 30 of Defendant's DSMF, she has only objected to the claim therein that "the administration of Zometa demonstrably had no effect on [Decedent's] kidney function." (See Doc. 38, at 4.) Accordingly, the other material facts set forth in Paragraph 30 are deemed admitted. See LR 56.1, SDGa; see also n.2, supra.
[7] "Aredia, like Zometa, is a bisphosphonate that is not recommended in patients with low kidney function." (DSMF ¶ 35 (citing Doc. 32-6, ¶ 21).)

6

2); Doc. 32-3, at 4.) Decedent passed away in February 2015 at the age of 51. (Doc. 29, ¶ 5.)

Plaintiff – as Decedent's successor in interest and administrator of his estate – initiated this action on September 15, 2015.[8] (Doc. 1.) On April 11, 2016, Defendant filed a motion to dismiss this action for insufficient service of process. (Doc. 7.) On October 11, 2016, Plaintiff filed her amended complaint. (Doc. 23.) On November 29, 2016, Plaintiff furnished the expert witness report of Daniel E. Buffington, Pharm.D., MBA. (Doc. 28.) On March 27, 2017, Defendant filed its present motion for summary judgment. (Doc. 32.) On June 1, 2017, the Court denied as moot Defendant's motion to dismiss. (Doc. 43.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (internal citation omitted).

---

[8] Defendant admits that Plaintiff brought this action after "having previously submitted a claim to the Department of Veterans Affairs which was denied within six months of the institution of this lawsuit." (Doc. 29, ¶ 3.) <u>See also</u> 28 U.S.C. §§ 2401(b), 2675(a).

7

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record before the court] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating that there is indeed a genuine issue as to the material facts of its case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. Matsushita, 475 U.S. at 587. The Court must also avoid weighing conflicting evidence. Anderson, 477 U.S. at 255; McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 934 (11th Cir. 1987). Nevertheless, the non-moving party's response to the motion for summary judgment must consist of more than conclusory allegations, and a mere "scintilla" of evidence

8

will not suffice. Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990); Pepper v. Coates, 887 F.2d 1493, 1498 (11th Cir. 1989). "The non-moving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" Bryant v. Dougherty Cty. Sch. Sys., 382 F. App'x 914, 917 (11th Cir. 2010) (quoting Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008); and Anderson, 477 U.S. at 249-50).

### III. DISCUSSION

In her amended complaint, Plaintiff alleges two medical malpractice claims pursuant to the Federal Tort Claims Act ("FTCA") against Defendant for the alleged acts or omissions of the "physicians, nurses, and other staff of the [VA]."[9] (Doc. 23, ¶¶ 20-27.) More specifically, Plaintiff's first count alleges that these staff members committed malpractice "by negligently prescribing [Decedent] renal toxic medications that caused him kidney failure after having previously diagnosing him with early stage renal failure multiple times and instructing him not to take any renal toxic medications" (hereinafter, the "Improper Treatment Claim"). (Id. ¶¶ 20-23.) Plaintiff's second count alleges that Defendant's staff also committed malpractice "by negligently failing to follow up with [Decedent]

---

[9] Plaintiff also alleges a "damages" claim to recover damages arising from her two substantive medical malpractice claims. (Doc. 23, ¶¶ 28-32.)

9

regarding his elevated PSA levels and allowing his cancer to develop and grow until it was end stage" (hereinafter, the "Failure to Diagnose Claim"). (Id. ¶¶ 24-27.)

**A. Improper Treatment Claim**

"Liability in an FTCA action is determined in accordance with the law of the place where the government's act or omission occurred . . . ." Stevens v. Battelle Mem'l Inst., 488 F.3d 896, 899 n.3 (11th Cir. 2007) (citing Cole v. United States, 755 F.2d 873, 879 n. 16 (11th Cir. 1985); and 28 U.S.C. § 1346(b)). As all relevant alleged acts and omissions occurred in Georgia, Georgia law controls Plaintiff's claims.

"To prove a medical malpractice claim in Georgia, a plaintiff must show: (1) the duty inherent in the health care provider-patient relationship; (2) breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure is the proximate cause of the injury sustained." Knight v. W. Paces Ferry Hosp., Inc., 585 S.E.2d 104, 105 (Ga. Ct. App. 2003) (citing Zwiren v. Thompson, 578 S.E.2d 862, 864 (Ga. 2003)). A plaintiff must present expert testimony to establish that the relevant medical professional breached the applicable standard of care and that this breach was the proximate cause of the relevant injury (*i.e.*, the second and third aforementioned elements). See Porter v. Guill, 681 S.E.2d 230, 235 (Ga. Ct. App. 2009); see also Zwiren, 578 S.E.2d

at 865 ("In order to establish proximate cause by a preponderance of the evidence in a medical malpractice action, the plaintiff must use expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson." (citations omitted)); Smith v. Luckett, 271 S.E.2d 891, 893 (Ga. Ct. App. 1980) ("The plaintiff's experts must demonstrate to the jury a deviation from the recognized and accepted standard of medical care prevalent in the general professional community for treating a patient with the signs and symptoms exhibited by the plaintiff." (citations omitted)).

"[I]n a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision." FED. R. EVID. 601. The Eleventh Circuit has previously held that "Georgia's evidentiary rules for a physician's expert testimony [*i.e.*, O.C.G.A. § 24-7-702] are so intimately intertwined with its malpractice laws that the rules must apply in an FTCA case for medical malpractice." See Dutton v. United States, 621 F. App'x 962, 966 (11th Cir. 2015). "[T]o qualify as an expert in a medical malpractice action in Georgia, the witness must (1) have actual knowledge and experience in the relevant area through either active practice or teaching and (2) either be in the same profession as the

defendant whose conduct is at issue or qualify for the exception to the same profession requirement."[10] Id. at 967 (internal quotations and alterations omitted) (citing Hankla v. Postell, 749 S.E.2d 726, 729 (Ga. 2013)); see also O.C.G.A. § 24-7-702(c).

Here, the only expert testimony provided by Plaintiff in support of her Improper Treatment Claim is that of Dr. Buffington. (See Doc. 28 (Dr. Buffington's expert witness report).) Notably, Dr. Buffington is a pharmacist holding a doctor of pharmacy (*i.e.*, a "Pharm.D."). (See Doc. 28-1 (Dr. Buffington's curriculum vitae); see also DSMF ¶ 15 ("Plaintiff's expert, Daniel E. Buffington, Pharm.D., is a pharmacist by training and experience" (citations omitted)).) Accordingly, Dr. Buffington is not competent to testify regarding the standard of care of medical doctors, nurses, osteopathic physicians, or physicians' assistants, as these are different professions from that of a pharmacist. See O.C.G.A. § 24-7-702(c)(2)(C); see also O.C.G.A. § 9-11-9.1 (categorizing "Medical doctors," "Nurses," "Pharmacists," "Osteopathic physicians," and "Physicians' assistants" as different professions); O.C.G.A. § 24-7-702(e) ("An affiant shall meet the

---

[10] This "exception to the same profession requirement" permits "a physician . . . to qualify as an expert as to a non-physician health care provider, but only if she has knowledge regarding the relevant standard of care as a result of having supervised, taught, or instructed such non-physician health care providers." Hankla, 749 S.E.2d at 729 (internal quotations, citations, and alterations omitted); see also O.C.G.A. § 24-7-702(c)(2)(D) (statutory basis for exception). Plaintiff has not argued that this exception is applicable to her proffered expert, Dr. Buffington.

12

requirements of this Code section in order to be deemed qualified to testify as an expert by means of the affidavit required under [O.C.G.A. §] 9-11-9.1."). Similarly, he is not competent to testify whether members of these different professions failed to exercise the requisite degree of skill or care inherent to their profession and therefore breached their respective professional duties. See Smith v. Harris, 670 S.E.2d 136, 140 (Ga. Ct. App. 2008) (because "a pharmacist is not a member of the same profession as a medical doctor. . . . the trial court abused its discretion when it allowed Dr. Katz [a pharmacist] to testify concerning Dr. Smith's [a medical doctor and internist] violations of a physician's standard of care." (citations omitted)). Therefore, Plaintiff has failed to satisfy at least one of the elements of her *prima facie* case against any medical doctors, nurses, osteopathic physicians, or physicians' assistants with regards to her Improper Treatment Claim. See Porter, 681 S.E.2d at 235; Knight, 585 S.E.2d at 105.

In her response to Defendant's motion for summary judgment, however, Plaintiff asserts that the reference to "other staff" in her Improper Treatment Claim was intended to refer to "the pharmacist at the VA that filled the prescription for Zometa." (Doc. 38, at 6 (citing Doc. 23, ¶ 21).) Yet Plaintiff has failed to cite to any materials in the record establishing that

13

a pharmacist at the VA did in fact fill the Zometa prescribed by Decedent's attending physicians and infused by a registered nurse.[11] (Cf. Doc. 32-1, at 3-9 (medical notes of attending physicians and registered nurse).) Moreover, even assuming *arguendo* that Plaintiff could establish that a VA pharmacist filled the Zometa prescription, Plaintiff has failed to provide expert testimony demonstrating that the *filling* of such a prescription would be a breach of that pharmacist's professional duties. (See Doc. 28, at 1-2 ("Based on my training, experience, and expertise, it is my professional opinion that the *therapeutic selection and use of* Zometa by the [VA] and its Oncology staff for the treatment of [Decedent's] metastatic prostate directly contributed to the development of his renal

---

[11] Indeed, the only materials cited by Plaintiff that relate to a VA pharmacist are: (i) a note from Ronald A. Knights, Pharm.D. dated June 12, 2014 (*i.e.*, approximately three weeks *after* Decedent received an infusion of Zometa) stating that Plaintiff reported that Decedent's "pain is not controlled" and that Plaintiff was on her way to the VA (doc. 32-1, at 3); (ii) a note from Dr. Knights dated July 10, 2014 (*i.e.*, approximately two weeks *after* Decedent had suffered acute renal failure and been placed on hospice care) stating that Dr. Knights advised Plaintiff that the VA "should be filling methadone" prescriptions for Decedent (doc. 44-2, at 1; doc. 44-3, at 13); (iii) a partial list of medications prescribed to Decedent – including zoledronic acid – that was signed by a certified pharmacy technician on July 16, 2014 (doc. 44-3, at 1-5); and (iv) Plaintiff's response to Defendant's interrogatories asserting that "Dr. Knight[s] made statements to [Plaintiff] Janice Allen that it was all their fault" (doc. 44-1, at 4). Notably, with regards to this final citation, Plaintiff has provided no information from which the Court can discern when Dr. Knights purportedly made these statements assigning fault, to whom he purportedly assigned fault (*i.e.*, to whom "it" refers), what exactly they were purportedly at "fault" for, and how Dr. Knights arrived at these purported conclusions of fault. Without this critical information, a factfinder would be forced to speculate as to the context and meaning of these purported statements and whether they are based on Dr. Knights' personal knowledge, rational perception, or scientific, technical, or other specialized knowledge – as opposed to speculation and conjecture. These purported statements therefore cannot create a genuine issue of material fact. See Bryant, 382 F. App'x at 917.

faiure [sic], need for dialysis and subsequent death." (emphasis added)).) Accordingly, Plaintiff has also failed to satisfy at least one of the elements of her *prima facie* medical malpractice Improper Treatment Claim against any pharmacist that may have filled Decedent's Zometa prescription. See Porter, 681 S.E.2d at 235; Knight, 585 S.E.2d at 105. Therefore, Defendant is entitled to judgment as a matter of law on Plaintiff's Improper Treatment Claim.

**B. Second Count - Failure to Diagnose**

In her response to Defendant's motion for summary judgment, Plaintiff states that - because of information learned during the discovery process - she "no longer feels it is appropriate to pursue" her Failure to Diagnose Claim and "chooses not to respond to that portion of . . . [D]efendant's motion." (Doc. 38, at 1-2.) Accordingly, the Court deems Defendant's motion for summary judgment unopposed with regards to Plaintiff's Failure to Diagnose Claim. Nevertheless, because it is unclear from Plaintiff's phrasing whether she intended to formally withdraw this claim, the Court must still consider its merits. See United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101-02 (11th Cir. 2004) ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion. The district court need

not *sua sponte* review all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion itself is supported by evidentiary materials. At the least, the district court must review all of the evidentiary materials submitted in support of the motion for summary judgment." (citations omitted)).

As with her Improper Treatment Claim, the only expert testimony provided by Plaintiff in support of her Failure to Diagnose Claim is that of a pharmacist, Dr. Buffington. (See Docs. 28, 28-1; see also DSMF ¶ 15.) Accordingly, Dr. Buffington is not competent to testify regarding the standard of care of – or the breach thereof by – medical doctors, nurses, osteopathic physicians, or physicians' assistants, as these are different professions from that of a pharmacist. See Section III.A, *supra*. Moreover, even if Dr. Buffington were qualified to opine as to breach or causation on a failure to diagnose claim, he has not done so. (See Doc. 28.) Therefore, Plaintiff has failed to satisfy at least one of the elements of her *prima facie* medical malpractice Failure to Diagnose Claim against any medical provider that may have failed to diagnose Decedent's cancer. See Porter, 681 S.E.2d at 235; Knight, 585 S.E.2d at 105. Accordingly, Defendant is entitled to judgment as a matter of law thereon.[12]

---

[12] Notably, in her sur-reply brief, Plaintiff has attempted to allege additional medical malpractice claims against Defendant. (See Doc. 44, at

16

## IV. CONCLUSION

Based upon the foregoing and due consideration, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's claims. Accordingly, **IT IS HEREBY ORDERED** that

---

4.) Therein, Plaintiff baldly asserts that "the plaintiff [sic] was not offered counseling, which is a breach of the standard of care . . . and furthermore, that even though the defendant [sic] requested several times to be informed about side-effects of all the medications, none were presented to the plaintiff [sic] regarding Zometa." (Id. (citing doc. 44-3, generally).) Even assuming *arguendo* that she has satisfied the relevant *ante litem* notice requirements for these new malpractice claims, see 28 U.S.C. §§ 2401(b), 2675(a), Plaintiff "may not amend her complaint through argument in a brief opposing summary judgment." See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (citations omitted). This is particularly true given that the allegations in Plaintiff's amended complaint are insufficient to put Defendant on notice that she intended to raise a claim of failure to counsel or lack of informed consent. (See Doc. 23.) Further, Plaintiff has failed to: (i) cite any particular parts of materials in the record that support the factual assertions underlying these new claims (cf. doc. 32-1, at 4 ("Pt. given information booklet on Zoemta [sic] and instructed on the side effects. Pt. verbalized understanding.")); and (ii) provide sufficient expert testimony to support these claims or otherwise demonstrate their viability. See O.C.G.A. § 31-9-6.1(d) ("A failure to comply with the requirements of this Code section shall not constitute a separate cause of action but may give rise to an action for medical malpractice as defined in Code Section 9-3-70 and as governed by other provisions of this Code relating to such actions; . . . as to an allegation of negligence for failure to comply with the requirements of this Code section, the expert's affidavit required by Code Section 9-11-9.1 shall set forth that the patient suffered an injury which was proximately caused by the surgical or diagnostic procedure and that such injury was a material risk required to be disclosed under this Code section."); GA. COMP. R. & REGS. 480-31-.01(c)(3)(i) (patient counseling not required of pharmacist for "in-patients of a hospital or institution where other licensed health care professionals are authorized to administer the drug(s)"); Blotner v. Doreika, 678 S.E.2d 80, 80 (Ga. 2009) ("Georgia does not recognize a common law duty to inform patients of the material risks of a proposed treatment or procedure." (citations omitted)); Chamblin v. K-Mart Corp., 612 S.E.2d 25, 28 (Ga. Ct. App. 2005) ("The Court's reasoning that the treating physician is in a better position to warn a patient of the dangers associated with a drug or medical device would seem to apply in the case of a pharmacist as well." (citing McCombs v. Synthes, 587 S.E.2d 594, 595 (Ga. 2003)). Accordingly, Plaintiff's last-minute claims regarding patient counseling and informed consent – raised for the first time in her sur-reply brief – are not properly before the Court, and Plaintiff has failed to demonstrate that justice requires that she be granted leave to amend. See FED. R. CIV. P. 15(a)(2). Finally, given that the deadline for Plaintiff to file her expert witness report expired on November 27, 2016, discovery closed in this matter on February 25, 2017, and the last day for filing civil motions passed on March 27, 2017 (see doc. 26), the Court denies Plaintiff's request in her response and sur-reply briefing for leave to file a new expert witness affidavit in this matter.

17

Defendant's motion for summary judgment (doc. 32) is **GRANTED**. The Clerk is directed to **ENTER JUDGMENT** in favor of Defendant on all of Plaintiff's claims, **TERMINATE** all other pending motions, if any, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 16th day of February, 2018.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA